Robert Jones
#73413-061
USP Terre Haute
PO Box 33
Terre Haute, IN 47808

FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 SEP 23 PM 1:00

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIVISION

UNITED STATES DISTRICT COURT
FOR THE SIXTH CIRCUIT
SOUTHERN DISTRICT OF OHIO

ROBERT JONES,
          Petitioner,

V

UNITED STATES OF AMERICA,
          Respondent.

)
)
)
)
)
)
)
)

Civ. Case No. Unassigned

Crim. Case No. 3:16-cr-00026-TMR-1

**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 USC §2255**

COMES NOW, Robert Jones, the Petitioner in this matter, pro se, and does hereby respectfully submit this Motion to Vacate, Set Aside, or Correct Sentence under 28 USC §2255. This motion is hereby timely filed as of this date, September 20, 2020. However, the Petitioner respectfully requests leave to amend for 90 days to allow for additional research & analysis due to the extraordinary impact of the COVID-19 pandemic on inmate movement, legal services, mail delivery, access to legal resources, & general restrictions severely hampering the ability of the Petitioner to meaningfully represent himself in post conviction relief proceedings.

## FACTUAL BACKGROUND

In September of 2014, the FBI became aware of a website (Target Website) operating on the Tor (The Onion Router) network, which contained, among other things, postings involving child pornography. The FBI monitored the Target Website, but was unable to act due to the inability to locate the host server, which is masked as a function of Tor.

In December of 2014, a foreign law enforcement agency, through use of indexing web crawlers (bots), identified the IP address of 192.198.81.106 as being associated with the Target Website. They advised the FBI of this information. Through subsequent investigation, FBI verified this information & obtained a search warrant, which was

executed in January of 2015, seizing a copy of the Target Website server from Centrilogic in Lenoir, NC. They placed this copy of the server onto government controlled servers in Newington, VA. From January of 2015 the FBI allowed the Target Website to operate unimpeded until February 19, 2015 when FBI personnel executed a search & seizure warrant at the Naples, FL residence of the suspected administrator of the Target Website (Steven Chase). The FBI shut down the Centrilogic server after Steven Chase's arrest on February 19, 2015.

The following day, on February 20, 2015, SA Caliope Bletsis, AUSA Whitney Dougherty Russell, & DOJ trial attorney Michael Grant submitted an Affidavit to District Judge Anthony J. Trenga in the Eastern District of Virginia (EDVA), in support of an Application for a Wiretap Warrant to intercept private messages & communications of users on the Target Website. This was followed by an Application by SA Douglas Macfarlane & AUSA Whitney Dougherty Russell for a Search Warrant presented to Magistrate Judge Theresa Carroll Buchanan in the EDVA purporting to Search Persons or Property located in the EDVA, using a NIT (Network Investigative Technique), an FBI designed malware tool used for gaining remote control of computers & forcing them to relay information & communications back to government servers through an unencrypted and unsecured channel over the regular internet called a PCAP (Packet Capture) stream. The "NIT" warrant requested authorization to search "any user or administrator who logs into the Target Website by entering a username and password".

Both warrants were signed by judges & executed beginning February 20, 2015. During this period, FBI turned on their version of the Target Website from government controlled servers in Newington, VA. This version was virtually identical to the original Target Website, even allowing new users to sign up, & for users to download & share child pornography the same as before. However, this version was hosted on servers which were significantly faster, and the FBI had altered some of the Target Website's code to allow them to deploy the NIT when users logged in.

The NIT Search Warrant was executed from February 20, 2015 until March 4, 2015.

This search resulted in at least 8,713 individuals having their computers searched by the NIT. Only 1,432 of those searched were in the USA, the rest were searched in over 120 countries and even a satellite in space was searched. Out of the 1,432 US Citizens searched by the NIT, the Petitioner is aware of only 137 individuals facing criminal charges in the United States, including himself.

On February 11, 2015, the NIT identified the user "billypedo". The NIT collected the hostname, the computer log-on name, the IP address, and the computer name. Using this information, law enforcement determined that Time Warner Cable was the service provider linked to the IP address.

In March 2015, law enforcement issued an administrative subpoena to Time Warner Cable for the subscriber information pertaining to the IP address identified by the NIT, during the time frame in question. Time Warner Cable reported to the government that the IP address in question was subscribed to Robert Jones.

Based on this information, a search warrant was obtained for Jones's residence to seize his computers, storage media, electronic devices, and records. On August 21, 2015, the FBI and the Anna Police Department executed the warrant at Jones's residence and seized, among other things, a Dell Inspiron 11" laptop, and an All-In-One HP computer Model 310-1020.

On November 2, 2015, United States Magistrate Judge Sharon Ovington signed and approved a Criminal Complaint, filed in the United States District Court for the Southern District of Ohio, charging Jones for evidence found as the result of the August 21, 2015 search and subsequent subpoenas.

Jones was arrested on November 4, 2015. On February 25, 2016, a federal grand jury in the Southern District of Ohio returned an indictment charging Jones with child-exploitation offenses, including coercion and enticement of minor females online, and committing a felony offense involving a minor while being required to register as a sex offender, in violation of 18 USC §2260A.

In July 2016, the same grand jury returned a Superseding indictment, charging

two additional counts under 18 USC §2251(a) and (e), a production offense stemming from digital videos found after further forensic examination of a device seized during execution of the search warrant.

On May 23rd, 2016, counsel for the petitioner filed a Motion to Suppress Evidence (ECF 33), which was later denied on February 2nd, 2017 (ECF 60).

A Motion to Compel Discovery & Motion for Frank's Hearing were both filed on June 12th, 2017 (ECF 68), and denied on August 28th, 2017 (ECF 77) & August 18th, 2017 (ECF 76) respectively.

Counsel then filed a Notice of Insanity Defense on August 30, 2017 (ECF 78) which was stricken & evidence excluded by motion of the government on September 12, 2017 (ECF 82).

The petitioner then had his Change of Plea Hearing on September 25th, 2017 (ECF 85).

Counsel for the petitioner then filed a Motion to Withdraw Plea on March 12th, 2018 (ECF 91), which was denied on April 11, 2018 (ECF 94).

The petitioner then filed a Pro Se Motion to Withdraw Plea & Appoint New Counsel on June 21st, 2018 (ECF 98), which was denied on July 16th, 2018 (ECF 100).

The petitioner then appealed to the 6th Circuit Court of Appeals, which affirmed the District Court's decisions on June 27th, 2019. The deadline for filing a Petition for Writ of Certiorari expired 90 days later, setting the deadline to file under 28 USC §2255 on September 25, 2020. This motion for relief under 28 USC §2255 is therefore timely filed.

## SUMMARY OF GROUNDS FOR RELIEF

GROUND ONE: Counsel was ineffective by misrepresenting plea negotiations & plea offers, as well as inaccurately & untruthfully advising how to proceed during plea negotiations. Counsel also failed to properly prepare for trial.

GROUND TWO: Counsel was ineffective by failing to raise substantive grounds & arguments available & known to counsel during pretrial motions phase. Counsel also raised multiple invalid arguments and/or meritless arguments during this phase, which further prejudiced the defendant. Counsel also hired an "expert" to examine the wrong discovery materials.

GROUND THREE: Counsel was ineffective by failing to present timely evidence before the court demonstrating the petitioner's mental health history and history as a victim of severe physical & sexual abuse from Satanic cult activity and ritualistic abuse as an infant and toddler. This precluded the defendant from presenting a defense.

GROUND FOUR: Counsel was ineffective by failing to investigate or "vet" experts hired, resulting in hiring a non-credible computer forensic "expert" and an "expert" of psychology who couldn't even remember where she obtained her PhD, & then revealed to have obtained it from a college which was shut down due to issuing fraudulent diplomas.

<u>ANALYSIS OF COUNSEL'S INEFFECTIVE ASSISTANCE THROUGHOUT PLEA NEGOTIATIONS,</u>
<u>NOTICE OF INSANITY DEFENSE, & WITHDRAWL OF PLEA</u>

Attorney Jon Paul Rion filed a Notice of Attorney Appearance for the Petitioner on March 2, 2016 ECF 22, followed by a Notice of Attorney Appearance by Attorney Nathaniel John Stuckey on March 16, 2016 ECF 24. Nathaniel Stuckey had been retained during a previous State case. He stopped by several times to explain the charges against the Petitioner, though he had limited time or information to do so. His major role was that he recommended Jon Paul Rion as an attorney when the Petitioner's now ex-wife contacted him. Jon Paul Rion & his firm Rion, Rion, & Rion LPA Inc. were responsible for plea negotiations, pretrial motions, & all other litigation throughout the case.

The first plea offer presented to the Petitioner was a choice of 20-30 years, or agreeing to a flat 24 years. This offer was presented to the Petitioner by Jon Paul, and the Petitioner's best estimate without the documents requested from counsel is that the plea offer was made on or around May 12, 2016 (See Exhibit A).

Jon Paul explained that with the 20-30 year range, the judge would have discretion to choose between that range, but with the 24 flat, that is what the Petitioner would receive. The Petitioner then asked, "Do you think you could get it to 18 flat?". To this Jon Paul replied, "Possibly, would you accept 18?" The Petitioner relied, "Yeah, I would accept 18, but if they won't do it, I'll take the 24." Jon Paul then said, "Alright, I'll see what they say, but I need you to sign this form. It's to show that I presented the plea offer to you." Reading over the plea agreement form, the Petitioner saw that the area Jon Paul wanted him to sign was to refuse the plea deal, so he asked, "If I sign to refuse, is the 24 still on the table if we can't get the 18?" To this Jon Paul replied, "Yeah, you'll still be able to take the first offer." Because of that statement, and ONLY that statement, the Petitioner signed to refuse the initial plea offer. If he had known the truth, he would have accepted the offer. This would also have resulted in not having a superseding indictment.

Over a month passed without hearing anything from an attorney, so on June 21, 2016, the Petitioner wrote a letter to Jon Paul Rion, asking him about the status of the plea negotiations regarding the 18 years, among other things (See Exhibit B). Jon Paul never replied, & on July 25, 2016, an arraignment hearing was held as to a first superseding indictment. The Petitioner appeared with counsel, who was evasive & appeared upset. Counsel wouldn't answer questions in the courtroom, & then while speaking to the Petitioner at the visiting/interview room in the Dayton Federal Building, he told the Petitioner that they would, "speak about everything later."

Over 2 months later, on September 30, 2016, Christian Cavalier, an attorney from Rion, Rion, & Rion LPA Inc. stopped by to visit the Petitioner (See Exhibit C). The Petitioner had left multiple messages with the secretary & paralegal stating that he needed to speak with an attorney in regards to the progress of the case & plea negotiations, and assumed this was why Christian had stopped by. The Petitioner asked Christian Cavalier about the progress of the 18 year plea offer, & Christian looked confused and said, "what are you talking about?" The Petitioner explained the conversation with Jon Paul, & Christian said, "As far as I know, there haven't been any discussions about 18 years. You turned down the last offer, & with this superseding indictment, you are now facing up to life." He continued on to say, "The reason I'm here is to have you sign these forms, I'm filing to appoint Jon Paul under the CJA & need you to sign these financial affidavits." See ECF 48. After Carefully reading them, the Petitioner signed them & then asked about the life sentence he was facing. Christian said, "Honestly, you'd be lucky to get 30 now, you need to talk to Jon Paul about it." The Petitioner then said, "I have information about a homicide that someone committed, would that help?" Christian looked interested & said possibly and that Jon Paul would come down to see him soon to talk about it.

After several meetings with Jon Paul about assisting the government, Jon Paul presented the Petitioner with the government's plea offer of 10 years if the Petitioner would assist with solving the homicide. Jon Paul told the Petitioner that he had reques-

ted immunity but that the government had declined. The Petitioner asked what Jon Paul recommended, & Jon Paul said, "Without immunity, if they fail to convict the real killer, they could come after you. Once they have the details they won't stop until they convict someone, and since you knew about it, chances are they'd come after you, even though you had nothing to do with it. You don't know these prosecutors like I do. They'll hide or cover up exculpatory evidence for a conviction if they have to, & the court always ignores it. I've seen it time and time again. I'd turn down the offer, but that's just me." Based on this conversation, the Petitioner decided to decline the 10 year offer for assistance.

On or around August 23, 2017, (See Exhibit D), the Petitioner & Jon Paul spoke about taking a regular plea. Jon Paul said that because of the superseding indictment, the Petitioner should probably try to get 30-40 years. The Petitioner told JP to see what plea he could get, but that he would prefer a conditional plea so he could appeal the pretrial motions decisions.

Jon Paul returned to visit the Petitioner shortly thereafter, to present 2 plea offers by the government. The first was 30-60 years, & the second was 25-life but also conditional, allowing the appeal of pretrial motions. The Petitioner wanted to wait to accept a plea, to allow time for Jon Paul to file the motions & arguments the Petitioner had been pushing him to file. Jon Paul told the Petitioner that the only other option at that point was to take the case to trial, since they had run out of time for the pretrial motion filing phase, which was a bad idea because, "I am not ready for a trial because I thought you were going to take a plea." Jon Paul explained that the only other way was to file for an Insanity Defense, based on the childhood abuse suffered by the Petitioner which Jon Paul & the Petitioner had spoken about at length over the past several years. (See Exhibit E). This conversation about the Insanity Defense took place on August 29, 2017 (See Exhibit F).

Jon Paul filed a Notice of Insanity Defense the following day on August 30, 2017 ECF 78. The Notice of Insanity Defense was ultimately stricken & evidence excluded

on September 12, 2017, ECF 82, due to being filed late, with counsel failing to seek leave to file out of time. In addition, counsel failed to vet the "expert" witness he hired. The expert, Mary M. Melton, did not provide a written resume with her report, but her cover fax identified her as operating the "Buckeye Driver Intervention Program", providing "Remedial Driving Classes". She testified by phone that she couldn't remember where she obtained her PhD in Forensic Psychoanalysis, & then a short time later "remembered" obtaining it through online coursework from Columbia Pacific University. Columbia Pacific University appears to have been an unaccredited institution now forbidden from issuing diplomas. See <u>Counsil for Private Postsecondary and Vocational Edu. v. Columbia Pacific University</u>, 1999 WL 35124872, App. Br. *4-11 (Cal. App. 1 Dist.). Mary Melton testified that she had no prior experience testifying as to a defendant's insanity defense, & during her interview of the Petitioner she had asked a series of ridiculous questions. Failing to "vet" this expert beforehand was clearly ineffective assistance of counsel. Not to mention that counsel told the court that he had only recently discovered the information about the Petitioner's past and that "this notice was filed as soon as was practicable-undersigned counsel acted with all due haste once the information giving rise to this defense was learned then verified through a third party." These were blatant lies. Not only did the court in its decision granting "Motion to Strike Notice of Insanity Defense & Exclude Evidence" point out that counsel had notice of the Petitioner's mental health history since 2015 from the US Pretrial Services Office Report which included an entire section on the subject, but the Petitioner himself had told Jon Paul about both his mental health history AND childhood Satanic Ritualistic Abuse back in 2016, both in person, & by mail (See Exhibit E). The Pretrial Services Report did not include information on the Petitioner's childhood abuse as far as he is aware, but he did mention it to counsel multiple times as evidenced.

The following week, on September 19, 2017 (See Exhibit G), Jon Paul visited the Petitioner again to speak about a plea deal. The 30-60 & 25-Life conditional plea

were still on the table. The Petitioner expressed the desire to take the case to trial & said, "I'll either get 60, which is essentially life, or I'll get life, either way I'm serving life. I already calculated my points at around 50, so I might as well take it to trial." Jon Paul told the Petitioner, "You'll get points taken off for acceptance of responsibility, & there are mitigating factors like your abuse as a child, you'll probably get 40 years if you take the 25-life." Unconvinced, the Petitioner said, "I want to be able to raise the issues you never raised in pretrial motions, we can do that at trial." Jon Paul told the Petitioner, "You can address those in appeals with the conditional plea." Jon Paul then said, "They [the government] don't want you to go to trial. You already know how far they went with the FBI harrassing your wife and family. If you go to trial they will harrass everyone you know or are in contact with. At least with the conditional plea you have a chance to get out someday." Based on this conversation, & the untruthful statement about being able to raise new issues at appeal, the Petitioner accepted the 25-Life conditional plea deal.

The following day, on September 20, 2017, a Change of Plea Hearing was set for September 25, 2017. A Change of Plea Hearing was held before Judge Thomas M. Rose on September 25, 2017 ECF 85, & a mental health evaluation was ordered for the Petitioner at Butner FCI in North Carolina. While in Butner, the Petitioner realized through research on the Electronic Law Library, that new issues could not be raised at appeal, as well as a strong argument that 18 USC §2260A violates the double jeopardy clause. The Petitioner wrote multiple letters to counsel explaining this, & requesting Jon Paul to withdraw the plea. The Petitioner also wrote letters explaining the willingness to accept a non-conditional plea & requesting Jon Paul to argue that 18 USC §2260A was inapplicable because he was only required to register for 10 years, & began registering before §2260A was passed, potentially violating ex post facto laws.

During his time at Butner FCI, the Petitioner also scheduled multiple teleconferences with Jon Paul through his receptionist/secretary. The majority of these calls were made on a direct line in Counselor Taylor's office, but prison records indicate

the Petitioner also called his attorney twice on 11/3/2017, & then once each day on 11/4/2017, 11/6/2017, 11/7/2017, & 11/8/2017.

Not once was the Petitioner able to get in contact with Jon Paul during his entire evaluation trip. Records show that every call lasted only 1 minute or less.

Shortly after returning to Butler County Jail following the Mental Health Evaluation, the Petitioner discovered that another Butler County inmate, whose case stemmed from the same NIT Warrant (Case No. 1:15-SW-89), had SA Alfin testify in a hearing before Judge Michael R. Barrett on January 22, 2018.(See United States v Stamper, Case No. 1:15-cr-00109-MRB; Doc. #94) SA Alfin testified that the exploit is seperate from the NIT, TR. 87 @ 9-11, and that he received information back when sending the exploit. TR. 96 @ 18-20. Alfin is specifically speaking about the exploit, not the NIT, See TR. 92 @ 22-24. Realizing that no data seized by the exploit had been released in discovery, & that the Motion to Compel Discovery involving the Exploit had been denied, the Petitioner realized that there was potentially exculpatory material which was never released in discovery by the government. The government released data allegedly captured via the NIT & sent back via a PCAP (Packet Capture) stream. The problem is, the PCAP stream is a component of the NIT, not the Exploit, & SA Alfin testified as to the distinction between the two, which means that any information the Exploit returned to the FBI was returned via alternative channels not disclosed to the defense. This was extremely important for 2 reasons, 1) Because the NIT Warrant never authorized an "Exploit" program seperate from the NIT to retrieve & send back information prior to the execution of the NIT Warrant. The government may describe the Exploit as a "battering ram", but a battering ram doesn't search & transmit data back to law enforcement. 2) Because of the potential exculpatory material never released to the defense, which would have verified claims made to defense counsel earlier by the Petitioner, allowing him to raise a valid defense.

The Petitioner wrote letters explaining this and more, & once again requesting for his attorney to file a Motion to Withdraw Plea to include this information. He also

called Jon Paul several times, explaining it at length, and mentioning two NIT cases, US v Harms, 2016 U.S. Dist. LEXIS 85940 (W.D.Okla. 2016) & US v Lough, 203 F.Supp.3d 747 (N.D.WV. 2016), both of whom were allowed to withdraw their pleas in order to address pretrial issues not earlier raised. The court in Harms applied the (7) prong test from US v Siedlik, 231 F.3d 744, 748 (10th Cir. 2000) & the court in Lough applied the (6) prong test from US v Moore, 931 F.2d 248 (4th Cir. 1991). Although the 6th Circuit is not bound by these decisions, it is bound by the (6) prong test in US v Mader, 251 F.3d 1099, 1105 (6th Cir. 2001), which is virtually identical, if not an easier standard to meet, than the other two. Jon Paul thought it was interesting and could possibly result in a successful withdrawl of plea, and on March 12, 2018 he filed a Motion to Withdraw Plea of Guilty, ECF 91.

On April 11, 2018, a hearing was held before Judge Thomas M. Rose as to the Petitioner's Motion to Withdraw Plea of Guilty. At this hearing, the Petitioner realized that his attorney had only made a single argument to withdraw the plea, leaving out all the relevant information they had discussed. Jon Paul raised an argument about the Petitioner only being required to register for 10 years & therefore inapplicable for the 2260A charge. However, as stated earlier, he failed to raise any other claims such as testimony by FBI Agent Douglas Roden stating that timestamps on digital files are unreliable, which the Petitioner had spoken to counsel about, & failing to include the claims discussed as to the exploit information seized or the fact that 18 USC §2260A violates double jeopardy because it must be predicated on an offense a defendant has already been found guilty of. This means that by charging a defendant with 2260A, he is being punished twice for the same conduct and evidence. This is similar to being charged for both possession and receipt for the same illicit photo or video. Not to mention that there are already enhancements in the U.S.S.G. for this, which means that by charging someone with 18 USC §2260A, you are punishing them twice for the same conduct, AND enhancing them on top of that for the same conduct. This can't be what Congress intended. Regardless, counsel failed to raise any of the substantive claims previously discussed,

and the Motion to Withdraw Plea of Guilty was denied.

The Petitioner still wished to withdraw his plea, but his attorney refused to file another motion to raise the substantive issues they had spoken about. For this reason, the Petitioner filed a pro se Motion for Withdrawl of Plea and Appointment of New Counsel on June 21, 2018, ECF 96, which was addressed at a hearing on June 27, 2018. The Petitioner had basically just written a simple letter to the Judge explaining several issues without going into a lot of detail because of wanting to file it as fast as possible. He brought supporting documents to court to present, to show why his plea should be withdrawn and new counsel appointed. Judge Thomas Rose asked the Petitioner why he hadn't raised these issues before the court earlier & the Petitioner replied that he wasn't aware that he could. The Petitioner was unfamiliar with legal proceedings and felt that conversations with the court were essentially one sided. He had been unaware that he could address the court directly with issues, & this is why he had been relying on his counsel to do this for him.

The Court would not allow the Petitioner to present the documents which he had brought, which included the transcripts of SA Alfin admitting the Exploit sent information back, a copy of a letter from May 20, 2016 to Jon Paul discussing the Petitioner's childhood abuse & mental health history, proving Jon Paul lied to the court, & a declaration by Mozilla showing that the Exploit used by the NIT had been "patched" on their Firefox Browser (which is the platform Tor uses), making law enforcement privilege obsolete, since that Exploit doesn't work anymore. The Petitioner had also brought transcripts of testimony by FBI Agent Douglas Roden stating that timestamps are unreliable, which would have jeopardized the government's position that 2260A applied due to a time stamp a SINGLE day before they claimed the 10 year registration would have expired.

The court then summarily denied the Motion to Withdraw Plea. Because of this, and knowing that the only thing left was sentencing, the Petitioner withdrew his motion to appoint new counsel, seeing it as pointless since he couldn't litigate any of his real issues. He knew his attorney had failed him, but at that point couldn't do anything

about it. Now, nearly two years later, he files this Motion to Vacate, Set Aside, or Correct Sentence due to Ineffective Assistance of Counsel at multiple critical stages of his case.

To the extent that the government may raise an argument about why the Petitioner would have accepted a plea deal and stated that he was satisfied with counsel's per-formance, the Petitioner points to aforementioned facts. The Petitioner felt he had no other viable options, & was unaware of the extent of counsel's deficient performance until after the plea had been accepted. Therefore, the plea was neither knowingly or intelligently accepted. The Petitioner attempted to timely withdraw, to address issues right away to prevent wasting time & resources, but was twice denied.

In Rodriquez v United States, No. 15-6306 (6th Cir. 2018), the 6th Circuit eased the prejudice showing required for ineffective assistance of counsel on plea agreements. The 6th Circuit indicates that a prejudice showing may be made in different ways, such as by 1) Identifying similar plea agreements reached in other cases with similar crimes, 2) By showing that the Petitioner would otherwise have gone to trial, or 3) By proving his decision-making process would somehow have been different from counsel's bad advice. Only one prong must be met to establish prejudice, not all three. It is undeniable in this case, that had the Petitioner's counsel been honest about consequences of refusing the 24 year plea deal at that time, that the Petitioner would have accepted it, there-by changing the Petitioner's decision-making process. Telling the Petitioner that a plea would still be on the table if he refused it, when it clearly wasn't true, was a blat-ant display of ineffective assistance of counsel, & prejudiced the Petitioner, resulting in a superseding indictment and a life sentence +10 years, rather than 24 years. This action alone, is enough to meet the prejudice standard set it Strickland, as well as the one from Rodriquez-Penton.

Further, counsel actually admitted to the Petitioner that he was not prepared for trial, & as a consequence of the resulting panic, filed an out of time Notice of Insan-ity Defense, in which he lied to the court about being unaware of the Petitioner's his-

tory as a victim of abuse & his mental health history. This was a clear demonstration of ineffective assistance of counsel, prejudicing the defendant by denying him a fair trial & otherwise available method of defense. Filing motions late and lying to the court is not an effective trial strategy.

Counsel for the Petitioner also convinced him to accept a 25-life plea deal by telling him that he could raise new issues at appeal, which was clearly untrue. Without these misrepresentations, the Petitioner had planned on taking his case to trial, & would have done so. This was also a clear demonstration of ineffective assistance under Strickland & Rodriguez-Penton, prejudicing the Petitioner as he would have other- wise gone to trial.

Finally, counsel failed to raise substantive claims during the Motion to Withdraw Plea of Guilty. As discussed, there were available claims related to newly discovered evidence because the plea was accepted on September 25, 2017 but the new Exploit infor- mation wasn't discovered until a hearing on January 22, 2018. The Petitioner notified counsel & there were lengthy discussions in which counsel agreed it was a good argu- ment. Failure to raise this claim & others available were ineffective assistance of counsel. Failure to have a strategy is not a strategy at all. The Petitioner was there- fore prejudiced by being unable to present viable claims & defenses.

## Analysis of Ineffective Assistance of Counsel Throughout Pretrial Motions

### I. Motion to Suppress

Counsel for the Petitioner filed a Motion to Suppress on May 23, 2016, ECF 33. This Motion was amended on November 21, 2016, ECF 53, and denied by the Court on Feb- ruary 2, 2017, ECF 60. This Motion to Suppress requested that the court suppress evi- dence derived from a NIT "Network Investigative Technique" Search Warrant. Counsel relied heavily on the decision in United States v Levin, 186 F.Supp.3d 26 (D.Mass. 2016), in which the court ordered suppression of all evidence derived as a result of the illegal search of the NIT. The Court in Levin found that the good faith exception

was inapplicable to a warrant which was "void ab initio." Counsel also raised an argument related to the lack of probable cause, as well as a branch addressing statements allegedly made by the Petitioner during the search of his residence & subsequent arrest. This branch was later withdrawn on April 17, 2017. The Petitioner is on record as saying that the Motion to Suppress was "sufficient", which is true for the majority of the suppression argument itself. However, the Petitioner has had time to discover many other deficiencies related to counsel's failure to include information which was available at the time, and/or brought to counsel's attention by the Petitioner. The Petitioner here alleges ineffective assistance of counsel in relation to the Motion to Suppress for the following reasons:

## A. **Failure to Include Relevant Evidence to Establish Bad Faith Behaviors of the DOJ & NIT Affiants**

Although counsel did passingly mention the Proposed Amendment to Rule 41(b), he failed to include available information provided to him by the Petitioner and otherwise available through investigation, to establish the fact that the FBI clearly acted in bad faith by requesting the NIT Warrant prior to the actual rule change. The Petitioner presented counsel with the majority of the following argument by both mail and via in-person interviews: (Even more evidence has since come to light)

Courts look to ALL the officials involved in the warrant process, including those who sought the warrant in the first place. United States v Leon, 468 U.S. 897, id @ 923 n.24 "it is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it **or** who provided information material to the probable-cause determination." As Supreme Court precedent, Leon is binding to the lower courts. In regards to the NIT Warrant Application, we know from the testimony of SA Alfin that not only was he involved, but the highest levels of the DOJ & FBI, AUSA Whitney Dougherty Russell, SA Douglas Macfarlane, CCIPS (Computer Crime & Intelligence Property Section), the FBI's Remote Operations Unit, FBI General Counsel, & more were all involved in vetting &

drafting the NIT Application. Normally, vetting an application for a warrant so thoroughly would be heralded as an act of good faith. However, in this case, it was clearly & obviously a conspiracy to obtain a warrant which those involved knew was illegal, & to attempt to word it just right so the issuing Magistrate wouldn't realize that she was signing to authorize a search of the ENTIRE PLANET AND SPACE. The FBI's Remote Operations Unit is the same unit which had applied for a similar warrant in "in Re Warrant to Search a Target Computer at Premises Unknown", 958 F.Supp.2d 753 (S.D.Tex. 2013), two years prior to the NIT Warrant in this case. This decision addressed the jurisdictional issues in obtaining a warrant to search targets in unknown locations and specifically ruled that an amendment to Rule 41 would be required to issue the warrant the DOJ sought. This decision was specifically cited by the DOJ in its letter requesting the rule change (See Exhibit H). This letter was sent just 5 months after the decision above.

The letters, writings, & communications between the Rules Committee and the DOJ display a clear understanding on the part of the DOJ that Rule 41(b) prevented a magistrate from authorizing a NIT Warrant. Among the material exchanged were drafts of what the proposed Rule 41(b) NIT Warrant would look like (See http://www.uscourts.gov/sites/default/files/fr_import/CR2014-04.pdf) These communications were not in private, but publically available. Over and over again, those advocating a rule change characterized the rule as preventing the issuance of an out of district remote access warrant when the locations of the targets were unknown. Sound familiar? These discussions took place before Playpen was even created. The DOJ noted "a practical enforcement problem on the ground." (See Exhibit I) & that "declining to modify the rule leaves the government without a way to get a warrant." (Id at 15), & that "Rule 41 currently provides no venue for a warrant application in such cases..." (See Exhibit J).

Over and over again the language used in discussions between the DOJ & Rules Committee reference the problems with Rule 41 when applying for a "NIT" type warrant "would enable investigators..." "permit the government..." (See Exhibit K @ 156-7)

"authorize a federal judge to issue a warrant..." (Id @ 246) "authorize a magistrate to issue a warrant..." (See Exhibit I @ 7) or "establish" a framework and confer authority (letter from the National Association of Assistant United States Attorneys to the Criminal Rules Committee regarding the proposed amendment to Rule 41).

The language is unambiguous. DOJ officials repeatedly argued to the members of the Rules Advisory Committee Rule 41 prevented law enforcement from taking necessary investigative steps. This language was repeated by committee members and was included in committee reports. If there was any doubt about this, no amendment would have been necessary. A two year campaign by the DOJ to get the rule amended would not have been needed. Both the Congressional Research Service and the National Association of Assistant United States Attorneys shared this understanding. And still the DOJ participated in and approved of Operation Pacifier while simultaneously seeking a rule amendment. Even FBI Director James Comey, in an interview with reporters about the proposed rule change, in reference to the way the rules were currently written said, "It is problematic for some of our most important investigations." And, "We're unable to go to a magistrate judge [because] we can't say for sure where the computer is."

Almost two years after the DOJ had proposed the rule change, but before the Rules Committee had approved it, the DOJ applied for the NIT Warrant in this case. The affidavit the DOJ submitted to the Magistrate Judge in the EDVA in 2015 is virtually identical to the proposed affidavit the DOJ submitted to the Rules Committee except for one part. In the NIT Warrant application used in 2015, FBI removed the section specifically referencing jurisdiction and Rule 41(b). (See the original NIT Warrant proposed to the Rules Committee [https://www.uscourts.gov/sites/default/files/fr_import/CR2014-04.pdf] pages 189-210. In addition, the Wiretap Warrant issued in the Playpen case prior to the NIT Warrant also has a section specifically devoted to jurisdictional authority, and it is signed by the same AUSA, Whitney Dougherty Russell, as the NIT Warrant. This demonstrates the DOJ, its employees and agents, knew Rule 41(b), as it existed at that time, did not authorize the deployment of the NIT outside the EDVA. The action therefore

is a clear example of bad faith.

In addition to the obvious knowledge of the DOJ & FBI that "Rule 41 currently pro-
vides no venue for a warrant application in such cases..." (Deputy Assistant Attorney
General for the Criminal Division David Bitkower only weeks after the NIT Warrant was
executed, but before anyone was charged or arrested), CCIPS was also used to vet &
draft the NIT Warrant & provide information & guidance throughout. CCIPS is the Depar-
tment which wrote a 2009 Manual for Federal prosecutors & law enforcement entitled
"Searching & Seizing Computers & Obtaining Electronic Evidence in Criminal Investiga-
tions." This manual was written 6 YEARS before the 2015 NIT Search, yet on page 84
(See Exhibit L) under Section 6. "Multiple Warrants in Network Searches," it clearly
states, "Agents should obtain <u>multiple</u> (emphasis added) warrants if they have reason
to believe that a network search will retrieve data stored in multiple locations."
SA Alfin admitted in <u>Anzalone</u> that prior to the execution of the NIT that, "yes, we
reasonably believed that there were members of the Playpen website throughout the
country and throughout the world." TR. 46 @ 20-25 & TR. 47 @ 1-2.

The DOJ manual further warns its lawyers and agents they risk suppression of evi-
dence if they seek a single warrant to search multiple locations, & warns that they
should ensure compliance with a strict reading of Rule 41. Although the manual does
not create any rights, privileges, or benefits, what it does do, in conjuction with
the other substantial amount of evidence mentioned earlier, is establish what a reas-
onable officer or prosecutor should know is "required of them". "It is one thing to
admit evidence innocently obtained by officers who rely on warrants later found in-
valid due to a magistrate's error. It is an entirely different matter when the officers
are themselves ultimately responsible for the defects in the warrant." <u>United States v
Reilley</u>, 76 F.3d 1271, 1281 (2nd Cir. 1996), on rehearing, 91 F.3d 331. The Supreme
Court has also held that responsible law enforcement officers are expected to know
"what is required of them" under the law and to conform their conduct to it. <u>Davis v
United States</u>, 564 U.S. 229, 241 (2012).

The exclusionary rule should be triggered by conduct sufficiently deliberate that exclusion can be a meaningful deterrent. Herring v United States, 555 U.S. 135 (2009). Suppression is appropriate "if it can be demonstrated law enforcement had knowledge or properly charged with knowledge that the search was unconsitutional under the Fourth Amendment." Illinois v Krull, 430 U.S. 340, 348 (1987) quoting United States v Peltier, 422 U.S. 531, 542 (1975). By not waiting for the Rules Committee to change the scope of Rule 41(b) before making its application for the NIT Warrant in the EDVA, the DOJ violated its own policies and procedures in this case. Further the DOJ did not tell the EDVA Magistrate Judge its application to change Rule 41(b) was still pending, nor did the DOJ tell the Magistrate Judge it was seeking a change because Rule 41(b) did not authorize the issuance of a NIT Warrant for use outside of the issuing district. The DOJ agents presented the EDVA Magistrate Judge with an affidavit the Rules Committee had not yet approved, for the issuance of a NIT Warrant in this case, an affidavit virtually identical to the one the DOJ had presented to the Rules Committee a year earlier, minus the jurisdictional section about Rule 41(b), which had been conveniently excised.

The federal agents who prepared the warrant for the Residential (OHSD) search in this case worked for the same agency, had the same training, and had the same information as the agents who submitted the affidavit for the NIT Warrant in the EDVA. They knew the agents who sought the NIT Warrant in the EDVA had ignored their training when they sought and secured a single warrant authorizing searches in multiple jurisdictions. They knew those agents had made a conscious decision to ignore the warnings they "risked suppression of evidence" if they sought and used such a warrant. Their decision to proceed was deliberate and knowing. This is especially true in SA Kinzig's case. She admitted to working for the Child Exploitation Task Force for a substantial length of time, and was the Agent in charge of Reibert's case in 2012, in which the jurisdictional problems with NIT Warrants was brought to light in the trial court. She had no reason not to know that there were jurisdictional problems with the NIT Warrant. "Responsible law enforcement officers will take care to learn what is required of them

under the Fourth Amendment precedent and will conform their conduct to these rules." Davis v United States, 564 U.S. 229, 241 (2011) quoting Herring, infra at page 599. "Numerous sources are now available to teach officers and their supervisors what is required of them under this Court's cases, how to respect constitutional guarantees in various situations, and how to craft an effective regime for internal discipline. See, e.g., D. Waksman & D. Goodman, The Search and Seizure Handbook (2d ed. 2006)..." Hudson v Michigan, 547 U.S. 586, 599 (2006).

The majority of courts have held that there was a clear constitutional violation, but that the agents acted in "good faith". Respectfully, the DOJ & agents knew what they were doing was wrong, but hoped to escape being held responsible because of the nature of the charges in this case. Agents took the unprecedented step of running a website that contained child pornography, then took the action of applying for a warrant they knew was not authorized under Rule 41(b). Knowing and deliberate non-compliance with the rules is exactly the behavior the exclusionary rule seeks to deter. It is also exactly the behavior which prevents this court from finding that any of the DOJ employees or agents acted in good faith.

The good faith exception to the exclusionary rule does not spare the Government from the consequences of its jurisdictional and Fourth Amendment violations. This is true because 1) the Government searched property outside the scope of the EDVA NIT Warrant; 2) Its violation of Rule 41 was knowing and approved by prosecutors and senior agents; 3) The EDVA NIT Warrant was based on intentionally false or reckless statements; and 4) The Residential OHSD Warrant was also based on intentional or reckless false statements. See generally United States v Leon, 468 U.S. 897, 919 (1984). The exclusionary rule is meant to deter just such "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Herring v United States, 555 U.S. 135, 144 (2009). "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu[l]" deterrence, and culpable enough to be "worth the price paid by the justice system." Davis at 240

quoting <u>Herring</u> at 144. As to the fact that the majority of courts have held that good faith applied, this is only due to the fact that nobody has raised such clear evidence of bad faith. All other courts have only considered a passing mention of the proposed amendment, without establishing what the Agents & DOJ Officials knew.

If this information had been presented in pretrial motions before the trial court, there is a good chance there would have been a different outcome at the district level. However, there is a 100% chance that the appeals proceedings would have been different. Appeals counsel filed an Anders Brief due to all the pretrial issues raised being generic issues already raised and litigated by other courts. No other defendant raised an analysis of bad faith by the government to such an extent. Appeals counsel admitted to the Petitioner that if trial counsel had raised these unique issues before the trial court, there would have been no need for an Anders Brief. The Appeals Court may have granted relief or denied it, but at this point we will never know due to the ineffective assistance of trial counsel. All we do know, is that the proceedings would have gone differently if an Anders Brief was never filed. The Petitioner finds that Appeals counsel acted appropriately in filing an Anders Brief, but was only required to do so due to the ineffective assistance of trial counsel as described herein. As stated in <u>Moorehead</u>, 912 F.3d @ 968 (6th Cir. App. 2019), "the good-faith exception is not concerned with whether a valid warrant exists, but instead asks whether a <u>reasonably well-trained</u> (emphasis added) officer would have known that a search was illegal." So, based on the facts, evidence, & arguments presented, counsel clearly displayed ineffective assistance by failing to raise substantive claims in regard to establishing the obvious bad faith of agents. See <u>Phillips v Hoffner</u>, 755 Fed.Appx. 481 (6th Cir App. 2018) citing <u>Strickland v Washington</u>, 466 U.S. 668 (1984) The prejudice prong asks whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, Id @ 694 "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Although the Government may argue that it wouldn't have made a difference because

of the circuit precedent at that point, the Petitioner respectfully disagrees. The majority of these arguments were never raised in any court, & the ones that were, did not examine so thoroughly the evidence of the agents & government's bad faith. It is entirely likely that there would have been a different outcome. In addition, even if the bad faith argument raised herein failed at the district level, (which we will never know), if it had been raised, there would have been no need for an Anders Brief as admitted by Appeals counsel. This fact alone establishes the prejudice required to establish ineffective assistance of counsel.

## B. Failure to Address Clear Errors by the Trial Court

In the Trial Court's decision to deny the Petitioner's Motion to Suppress, ECF 60, the court held the following:

1) That "The network investigative technique is akin to a pen register..."

2) That the NIT is valid as a tracking device under Rule 41(b)(4)

3) That "the search actually took place in Virginia"

4) That "once a visitor logged onto the website in Virginia and downloaded pornography, NIT was deployed."

## Analysis of Errors

1) & 2) - The network investigative technique is akin to a pen register & the NIT is valid as a tracking device under Rule 41(b)(4)

The definition of a pen register under 18 USC §3127 specifically states that information seized "shall not include the contents of any communication." The NIT clearly included contents of communications, otherwise a PCAP stream wouldn't have been needed. Not to mention that in US v Stamper, No. 1:15-CR-109, SA Alfin testified that the NIT is not a pen register or network intercept, but a search, pursuant to a search warrant. TR. 100 @ 5-7. In the Affidavit itself on paragraph 41, the government stated that, "to the extent that use of the NIT can be characterized as a seizure of an electronic communication or electronic information under 18 USC §3103a(b)(2), such a seizure

is reasonably necessary..." Clearly the government intended the NIT to be a search & seizure. Not only this, but admitting that the NIT is a seizure of an electronic communication or electronic information as defined in §3103a(b)(2) would imply that it's actually governed under §2510 et seq., or §2701 et seq., which only brings up more problems related to jurisdiction. The plain language of the Stored Communications Act 18 USC §2701 et seq., expresses legislative intent to limit out of district authority to cases involving terrorism. Also, under 18 USC §2510(12)(C), electronic communication does not include any communication from a tracking device as defined in §3117. So basically, under statutory definitions & the testimony of the lead case agent, the NIT is neither akin to a pen register nor a tracking device.

### 3. The Search Actually Took Place in Virginia

First, the court primarily cites either NIT cases FROM Virginia to make this point, or other cases from outside Virginia which cite cases IN Virginia for their argument. Obviously if one was IN Virginia, the search would take place IN Virginia. See Darby, 2016 WL 3189703 (EDVA), Matish, 2016 WL 3545776 (EDVA), & Lough, 2016 WL 6834003 (EDVA), etc.

Second, by the court's logic, wouldn't the actual search have taken place in Maryland since the agents monitoring the site & sending the NIT were actually in Maryland & not Virginia?

Third, if the "search" took place anywhere, then it wasn't a tracking device.

Fourth, the NIT didn't seize location data. It would travel to a host computer, install itself, seize control of the computer temporarily to search it for the relevant information, and seize & transmit this information back via the regular internet (not Tor) to law enforcement. Law enforcement had to perform subsequent investigations & subpoenas to identify the users. Nothing in Virginia was searched or seized in this case. This is further affirmed by the fact that practically every appeals court has either held, or assumed without deciding, that the NIT constituted a search, violating

the Defendant's rights under the 4th amendment.

### 4. Once a visitor logged onto the website in Virginia and downloaded pornography, NIT was deployed

This is a perfect example of the misleading nature of the NIT Warrant Application & subsequent misleading testimony by Special Agents. The way they describe the functionality of the NIT in vague & obscure terms has convinced many many judges of these false perceptions, including the original Magistrate. Prosecutors in US v Kim, 16-CR-191 (EDNY) even admitted that there was no way to determine if a user downloaded pornography. Not to mention that a lot of users of the Tor Network open a command module by entering "about:config" in the Tor address bar and use it to disable java, flash, & auto image loading. Anyone who did this would never see ANY pornography by simply browsing Playpen, yet they would still get searched by the NIT. This is probably why 1,110+ US Citizens searched by the NIT were innocent.

### C. Failure to Raise Motion to Suppress on Illegally Seized Phone

On or around July, 2014, the Petitioner was arrested in Logan County, OH for a misdemeanor charge of "contributing to the deliquency of a minor." During his arrest, Logan County Officers seized his iPhone 5, IMEI# 013888008166962. The charges were dropped & a search warrant was never procurred for this phone by Logan County. After subsequent litigation related to a failure to register charge, the Petitioner eventually plead guilty to a single misdemeanor count of "obstructing official business" & immediately paid the fine of around $100 in full. After his release, both the Petitioner, & his then girlfriend Heather Dulaney called Logan County asking for the iPhone back. After a lot of excuses & clear evasion tactics, officials at Logan County claimed that the phone was "lost or missing." This brings into question the evidentiary chain of custody and integrity of the evidence allegedly found on the device later by FBI. This is further supported by Melandaz-Diaz v Massachusetts, 557 U.S. 305 (2009) "It is the obligation of the government to establish chain of custody... that is, to establish "the identity

and integrity of physical evidence by tracing its continuous whereabouts."

The Petitioner and his girlfriend both expressed a clear desire to retrieve the phone, and did NOT surrender or abandon it. After both calling and writing to ask for the return of the phone, and either being denied or ignored, with no response to written requests, the Petitioner contacted a legal representative about retrieving the phone & also the fact that he was no longer required to register since his end of registration date was August 26, 2013. Before this process could begin however, primarily due to insufficient funds to hire counsel, the Petitioner was arrested on the current charges. FBI was able to retrieve the phone which Logan County Officials were illegally holding, & used the contents thereof to charge the Petitioner with at least one additional criminal count. Arguing that this is proper because the FBI obtained a subsequent warrant is a blatant disregard of the 4th amendment protections against "unreasonable" searches or seizures. This being allowed would be analogous to law enforcement randomly seizing electronics from people without warrants, holding them for infinite periods of time without consent from the owners, & then applying for a warrant to search if probable cause ever occurred. This is absurd & clearly not what the framers intended. Not to mention that State officials had already accessed the phone, as evidenced by the fact that they used it to call the Petitioner's girlfriend. This is in clear violation of the precedent set by Riley v California, 134 S.Ct. 2473 (2014). It was clearly prejudicial to the Petitioner that counsel never even attempted to raise a suppression issue on this matter, & this was a clear example of additional ineffective assistance of counsel.

If the information & arguments presented herein had been presented by trial counsel when he had the opportunity, there is a good chance that there would have been a different outcome at the trial court. These arguments were brought to counsel's attention on multiple occasions, either by written correspondence or in person visits, & failure to raise valid & substantive claims is not a valid strategy, but a lazy one. We don't know how the trial count may have ruled, but even if these facts, evidence, & arguments still resulted in a denial at the trial court level, it would have provided

an opportunity to raise issues at appeal which had not already been addressed by the 6th Circuit Court of Appeals. This would mean that an Anders Brief would not have been necessary. The fact that the outcome would have been different but for counsel's failures clearly meets the standards set out in Strickland. See Phillips v Hoffner, 755 Fed.Appx. 481 (6th Cir. App. 2018) citing Strickland v Washington, 466 U.S. 668 (1984) The prejiduce prong asks whether there is "a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." Strickland, Id @ 694 "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Although the Government may argue that it wouldn't have made a difference because of the circuit precedent at tht point, the Petitioner respectfully disagrees. The majority of these arguments were never raised in any court, & the ones that were, did not examine so thoroughly the evidence of the agents & governments bad faith. It is entirely likely that there would have been a different outcome.

## II. **Motion to Compel**

On June 12, 2017, counsel for the Petitioner filed a Motion to Compel Discovery, ECF 67. This Motion was overruled on August 28, 2017, ECF 77. Counsel sought to compel, among other things, "a mirror image forensic copy of the NIT or any additional software utilized in the investigation of Jones." Counsel argued that the requested information was necessary to "authenticate the functions of the software," "to validate its calibration," and "to determine its functionality and reliability." (ECF, Motion to Compel, PageID 828.) Counsel for the Petitioner argued that the "functionality and reliability of the Software is directly at issue with regard to the arguments presented" and "is certainly relevant at trial as the entire case against Jones commenced by way of the Software itself." Counsel concluded that "the reliability and methodology of the Software is directly at issue." (Id., PageID 829.)

While these are true points, they lack an explanation of a real reason why the

requested discovery is material to the trial defense of the Petitioner. Counsel had spoken with the Petitioner multiple times regarding these issues, and he failed spectacularly when it came to presenting an explanation of materiality to the court.

Sometime in 2016, most likely between August and November, the Petitioner wrote a letter to Jon Paul specifically explaining that he had never gone to the Playpen site "upf45jv3bziuctml.onion" or registered an account, "billypedo" or otherwise. The Petitioner also spoke at length about this fact with Jon Paul, explaining that until he moved to Piqua, OH, he had hosted Tor nodes from his residence, which means that his IP address would have actually appeared on server requests on any Tor website a user went to using his connection as an "Exit Node." This activity is entirely legal and is how Tor functions as a community of volunteer "nodes". All data and communications from Tor are routed through these "nodes". As such, "host nodes" (volunteers' computers) are protected by the ECPAs protections on routing communications. See 18 USC Chapter 119 §§2510 et seq., which was amended by Title 1 of the ECPA, as stated in Wachter, Inc v Cabling Innovations, LLC, 387 F.Supp.3d 830 (MDTN 2019).

The reason that this is relevant and the Motion to Compel is material, is because the Petitioner was initially misidentified by the "NIT", & the NIT IS A WITNESS. It is a tool of the FBI, just as a drug sniffing dog is a tool of the FBI. The reliability of training and other factors regarding the accuracy of a drug dog are regularly allowed to be examined and tested in both State & Federal Court, as the dog is a witness and tool of law enforcement.

The FBI claims the NIT identified the Petitioner as "billypedo" & it is his position that he was never "billypedo" on Playpen or otherwise. That identification is the entire root of the case. Without that identification, FBI would never have searched or seized anything from his residence or otherwise.

There are a few ways that this misidentification could have happened, & these were discussed with counsel at length.

1) The NIT identified a user logging in under "billypedo" but went directly to the

exit node associated with it instead of the actual user's computer, but this would have identified the Dell laptop, which was being used to host Tor nodes, not the HP Touchscreen.

2) FBI used data & information seized by the NSA through their "Stellar Wind Program[1]" in order to set up a parallel construction. The NIT never functioned, the FBI just fed information into it to obtain search warrants. This would also explain why they won't release the Exploit, because it doesn't exist. Also, this is incredibly illegal, but actually less illegal than them operating a child porn site, ironically.

3) Similar to 2), parallel construction, but obtaining server & computer information from Logan County Sherriff's Office when they illegally searched the Petitioner's electronic devices at his residence in SHELBY COUNTY. They had access to device host names, MAC Addresses, & the IP address at the time the "NIT" supposedly searched the Petitioner's computer. This scenario seems the most likely, considering the intimate connections between Logan County and the FBI, including the illegal seizure and transfer of the Petitioner's iPhone.

This sounds incredible until you realize that out of 1,432 US Citizens "searched" by the NIT, only 137 US Citizens were criminally charged. If there was probable cause to search every user on Playpen with the NIT, then why is this number so low? less than 10% cannot be probable cause by any standards. The FBI may say the reason for this is the use of VPNs, but the majority of VPN users use VPNs in the United States, which can still be subpoened for IP information. So why was it so low? And why haven't we heard of any other people experiencing residential searches besides the 137 charged? Because the FBI already knew they had illegal material from prior illegal access to their devices!

Someone who doesn't know better may think that this is still ridiculous, & that the US Government has good intentions 100% of the time, but recent events have shown quite the opposite.In the Crossfire Hurricane Operation, fraudulent FISA applications

---

[1]An operation the NSA has been using to collect ALL internet traffic, cell phone data & calls, & more from US Citizens for more than the past 10 years. They maintain the majority of this untargeted data in an enormous data center in Bluffdale, UT and smaller covert data centers around the world. NSA officials use a tool called XKeyscore to search this data. See http://www.npr.org/templates/transcript/transcript.php?storyID= 761918152

signed by high level DOJ iofficials were used in an attempt to unseat the current sitting President. Sean Hannity, Tom Fitton, & many others were surveilled by the US Government for political reasons, as recently verified via FOIA releases. Exculpatory evidence was illegally hidden in the Enron cases to set people up. Also look what happened to Carter Page, Michael Flynn, & Roger Stone. Another example is Operation Stolen Dreams, in which the FBI task force was financially incentivized to obtain as many indictments as possible, leading to massive corruption, hidden exculpatory evidence, forged evidence logs, etc. And we all know about the Fast & Furious scandal with firearms & cartel members. This case, Operation Pacifier, is already on this list. NYTimes, Washington Post, USA Today, Chicago Tribune, Motherboard.com, TechDirt, and many more news organizations are already pointing out the blatant illegal activity by the Government in Operation Pacifier and the lengths the courts are willing to go to protect them. The Petitioner told his counsel that "we need to open the eyes of the court to the blatant illegalities & intentional illegal conduct by the government." You know what he said? "We both know they did this knowingly, but I have a reputation with the court I'm not willing to jeopardize." Where do you go from there? How do you respond to that? Especially as an indigent person who has spent all the money they have for the lawyer who said that. The court is supposed to be a neutral arbitrator. Having a "reputation" with the court should not affect the courts decisions one way or another unless they are not actually neutral or detached. Raising controversial issues because they have a strong corrolation to a client's case shouldn't prevent counsel from proceeding for any reason.

This may have all seemed off topic, but the point is that, among many other reasons, the systemic misconduct by the government makes the information requested in the Motion to Compel material because it can be used to impeach government credibility. Just look at what was discovered by a court in Tacoma, WA. In United States v Tippens, No. 3:16-cr-05110-RJB-1 (An Operation Pacifier Case), the court granted a defense motion to dismiss based on the Government's refusal to disclose the NIT components and

its efforts to prevent the defense from introducing government documents that undermined the prosecution's claims that the NIT did not alter or corrupt evidentiary data. The court also found that the prosecution was withholding information that would have enabled the defense "to attack the Government's credibility as to representations made at ex parte and in camera [classified information] hearings" that had previously been held in connection with defense motions to compel discovery. This shows that even in these NIT cases, the government is hiding information & lying to maintain or obtain convictions.

Another fact that should have been raised in the Motion to Compel, is that Mozilla (the creator of the browser used as the Tor Browser platform) released a statement that they had "patched" the method of intrusion that the NIT Exploit used. This statement was made before counsel filed the Motion to Compel & the Petitioner had spoken to him about it. Mozilla patching the method of intrusion means that the Exploit won't be effective anymore, removing law enforcement privilege. Law enforcement privilege was also removed because, according to the FBI, the Exploit no longer works with the updated Tor browser. Mozilla also stated in a related Motion to Intervene that the Exploit method used by the FBI compromises the security of a user's computer, leaving it completely open to 3rd party access to take total control of their machine.

Another issue not raised by counsel is the fact that the "Tor Browser" operates in a "sandbox" (See Exhibit M) A sandbox,as used by Tor, along with Tor's "disc avoidance feature," prevents outside sources from interacting with the host computer outside of the "sandbox". This means that any exploit which forced or enabled the host computer to send outside communications via a PCAP stream HAD to significantly alter the user's current networking configuration, as well as the registry (system files) & RAM (Random Access Memory). Not to mention that by the FBI's own admission, the PCAP stream is TWO-WAY. If the NIT installed itself as they say, on the host computer, and the NIT provided instructions to the computer to send the requisite information back to the FBI server via a PCAP stream, then why is it TWO-WAY? This means that the FBI server was sending

information TO the user's computer. Why? And what did it send? Additional instructions? Pornography? As an FTP (File Transfer Protocol) server it could have been literally anything. The government alleges that no evidence from the Dulaney_PC would be used at trial, making the NIT & Exploit immaterial, but the Petitioner's iPhones & iCloud accounts were linked to that computer, so unless the government plans on dropping the charges stemming from the Petitioner's iPhone and iCloud accounts, the NIT & Exploit would be material via that channel, though also through the other channels as described herein.

Finally, counsel failed to actually have the Computer Expert, Tami Loehrs, examine the NIT components or the Cygnus report. He had her examine the HP All-In-One laptop and Dell Laptop, after lengthy discussions with the Petitioner about hiring an expert to examine the NIT components & to testify about the materiality of the "Exploit". The Petitioner had been under the impression from counsel that this is the entire reason they would hire an expert, & his father paid $7,500.00 to Jon Paul's law firm for the sole purpose of hiring a computer expert to examine the NIT info & Cygnus Report to provide a statement or declaration on whether or not the exploit was material. Once again, Jon Paul had the expert he hired examine the wrong data & provide a pointless examination report. The Petitioner had specifically told Jon Paul he did not want her to examine the computers because it would be pointless, since Tor uses a "disc avoidance feature", which prevents it from writing temporary files, cookies etc. (information which could be used to establish browsing history, etc.) The Petitioner had also mentioned the fact that, according to the FBI, the NIT erases all traces of itself afterwards, so there would be nothing in the computers that would be nearly as important as reviewing the actual NIT information itself. Even the expert verified the Petitioner's statements to counsel when she said the Tor browser "does not record a history of the user's activity & limits data cached to the computer." (ECF 72, Report @ 888)

### III. Motion for Frank's Hearing

Counsel for the Petitioner filed a Motion for Frank's Hearing on June 12, 2017, ECF 68. This motion was eventually Overruled by the court on August 18, 2017, ECF 76.

Counsel directed this Motion at Special Agent Kinzig's initial 307 South Second Street Affidavit. He made the following claims, among others:

1) No evidence whatsoever of child pornography was found on the HP computer (ECF 72, Motion @ 836-837)

2) The creation date of Tor browser was April 22, 2015, which means it was actually installed AFTER the NIT allegedly searched it.

3) "In this case, the government filed a "Request for Delayed Notice" but failed to execute the NIT during the proposed time period." ECF 68 @ 7.

First, Counsel for the Petitioner directed the Motion for Frank's Hearing AT THE WRONG AFFIDAVIT! This will be subsequently addressed, but, assuming that there was a strategy to raise this Motion against SA Kinzig's Affidavit, the Petitioner here outlines the failures & ineffective assistance of counsel as it pertains to the aforementioned (3) claims:

1) Although it IS true that no evidence of child pornography was ever found on the HP computer, contrary to the claims in SA Kinzig's Affidavit, counsel failed to file a Motion to Reconsider or for Leave to Respond to the Government's Opposition in ECF 74 addressing the bait & switch they did. The government claimed that in regards to child pornography never being found on the HP, that "his examiner actually reached the opposite conclusion, i.e., that child pornography was indeed found on the computer, just not in the allocated space. (ECF 72, Report at 853-854.)" While it is true that the examiner did state this, she was only repeating what the government had alleged. She never independantly discovered ANY child pornography on the HP computer, in either allocated or unallocated space. The government actually cited THEMSELVES as evidence that what THEY said was true! This is almost exactly what the FBI did in Crossfire Hurricane. They cited a Yahoo article written BY Christopher Steele, authenticating his own phony dossier, as evidence that the dossier was legit. In addition, the government was unable to provide the child pornography they allegedly found on the HP Computer. Counsel for the Petitioner also failed to address SA Kinzig's credibility.

On August 21, 2015, when SA Kinzig & other FBI executed the first search warrant at the Petitioner's residence, she and other agents essentially locked the Petitioner in his son's room sitting on a chair, while one agent stood by the door to prevent exit, & one behind the Petitioner, who was handcuffed. This is after they placed the Petitioner in the trunk of his wife's Ford Edge. SA Kinzig, who was sitting in front of the Petitioner, kept asking him questions. The Petitioner asked multiple times if he was under arrest, & was told no. When asking if he was free to leave, the agents said, "Yeah, you're free to go." Yet, he remained handcuffed & the agents wouldn't physically allow him to leave. The overbearing presence of armed FBI & not being allowed to leave when they clearly said he could, made the Petitioner incredibly uneasy, thinking if he actually stood or attempted to leave, that he would be shot. It's for this reason alone that he agreed to talk. During the subsequent interrogation by SA Kinzig, there was a knock at the door, & a young looking male agent said, "We did the prelim examination of the computers and didn't find anything, what do you want us to do? Kinzig looked angry and said, "Bag & label everything, we're taking it all." Keeping this event in mind, during grand jury testimony, a grand jury member specifically asked SA Kinzig if they had done a preliminary examination of the devices at the residence before seizing them & SA Kinzig responded that they did not (See Grand Jury Transcripts). These facts were discussed with counsel, & he failed to pursue or even present any of it. These facts clearly impeach Kinzig's credibility, & it was ineffective assistance of counsel to neglect to raise them.

2) Counsel failed to bring up the fact that Windows saves installation data in its recovery files. This could have been examined to show that Tor was actually installed for the first time on April 22, 2015. It was the Dell Laptop the Petitioner used to host Tor Nodes, but he had deleted Tor several months before & installed it on the HP Computer, because that computer was faster.

3) The argument counsel made regarding delayed notice is almost laughable. He claimed

that, "In this case, the government filed a "Request for Delayed Notice" but failed to execute the NIT during the proposed time period." ECF 68 @ 7. This argument doesn't even make sense, & the FBI DID execute the NIT during the proposed time period. The fact is, the Petitioner spoke to Jon Paul about a similar argument for an extended period of time, asking him to file a Motion to Suppress based on the FBIs violation of Rule 41(f)'s Notice provisions. The NIT Warrant specifically authorized Delay of Notice "to the person who, or whose property, will be searched or seized for 30 days (not to exceed 30)". Yet the Petitioner, who was allegedly searched by the NIT in February of 2015, did not receive notice until March 2016, 13 MONTHS later. Not only had the FBI identified the Petitioner in March of 2015, but they also executed TWO subsequent residential searches & still failed to provide notice until over 4 months after the Petitioner had been arrested. Counsel for the Petitioner screwed up the entire argument, not raising any relevant facts or evidence or even structuring the argument in a coherant form.

Although other courts have raised similar arguments & failed, being unable to establish prejudice to the defendant or intentional or reckless disregard by officers, the Petitioner & his counsel were uniquely positioned to do so in this case. See, in 2012, another NIT Operation was executed called Operation Torpedo. As a result of this Operation, at least 13 individuals were arrested. One of these individuals was <u>United States v Reibert</u>, 2014 U.S. Dist. LEXIS 181252 (8th Cir. 2014). Because of the way the courts decided to hear these cases, the majority of those charged were heard together, essentially as codefendants. The reason that this is relevant, is because <u>Reibert</u> was from the Southern District of Ohio. His Special Agent was SA Kinzig, attorney was Jon Paul Rion & his firm, & he had the same expert as the Petitioner, Tami Loehrs. Sound familiar? In <u>Reibert</u>'s case, jurisdictional authority of the NIT was also contested, though the court declined to rule on the specific issues. More importantly, Delayed Notice was also violated in Reibert's case, as well as for all of his codefendants, ranging 4-5 months late delay. The courts denied the Motions to Suppress due to late notice because they didn't find prejudice or intentional or reckless disregard to the rules, as outlined

in <u>Leon</u>. They also said it was unlikely to occur again, so there was no reason to deter officers. Well, it has occurred again. 137+ more times actually. The Petitioner is unaware of a single Operation Pacifier case in which a defendant was notified in time, or any of the 1,100+ innocent people searched being provided notice at all. This fact, the fact it keeps happening as a systemic problem, & the fact that the face of the NIT Warrant blatantly required notice & the Affiant devoted multiple paragraphs (38, 39, & 40) to delayed notice is a clear display of intentional disregard, or reckless at the very least. Both of these mandate suppression to deter misconduct under <u>Leon</u>. Failure of counsel to raise any of this incredibly relevant information, or to build a substantive argument is clearly ineffective assistance of counsel. The fact that he had previously represented Reibert only enhances this fact.

### Available Information Counsel Failed to Raise by Failure to Address NIT Affidavit in Motion for Frank's Hearing

Prior to the filing of the Motion for Frank's Hearing, the Petitioner had multiple conversations with counsel in which they spoke at length about the blatant lies & omissions & misrepresentations by SA Macfarlane in the NIT Affidavit. Counsel agreed that a simple reading of the affidavit by any moderately tech savvy person made it blatantly obvious that the affidavit was worded to mislead the magistrate judge. The Petitioner also wrote counsel multiple times prior to filing, at least once in April 2017, and once on June 1, 2017 (The Petitioner has a copy of this letter in his possession.)

### A. Claims Which Courts Have Consistently Held Establish Probable Cause

1) "On the main page of the site, located to either side of the site name, were two images depicting partially clothed prepubescent females with their legs spread apart..."

2) Registration message saying new users must enter an email address, but to NOT use a real email.

3) Description of the internal site as being dedicated to child pornography

4) Name of the site "Playpen"

5) That the site is located on the Dark Web, making it unlikely to run across accidentally, because you can't use Google to find Tor addresses & Tor sites aren't indexed.

6) That multiple affirmative actions must be taken to access the site.

## Analysis of Problems With These Claims,
## Which the Petitioner Requested Counsel to Raise

1) The described images were not present when the NIT Warrant was executed. The administrator had changed them prior to his arrest & FBI saw the changes on his computer prior to executing the NIT Warrant. The new image is of a young woman of indeterminate age, clearly not prepubescent. She is wearing a short striped dress and stockings, sitting in a chair with her legs crossed. This young woman is fully clothed, and appears to be around her early 20s. (See Exhibit N)

2) This is used to be misleading, implying that entering a fake email is somehow indicative of criminal intent. Tor is designed to be ANONYMOUS. Practically all Tor sites recommend using a fake email to maintain anonymity, & the majority of Dark Web sites are entirely legal. It would be more out of the ordinary to ask for a REAL email address. The instructions on the homepage actually tell users that the forum software requires an email and this is later verified as being true by SA Alfin in Anzalone, No. 15-10347, See TR. 48 @ 21-25 and TR. 50 @ 1-5.

3) Although there is child pornography present in the internal site, there are also legal areas such as software, technology, & security discussions, IRC Chat, private messaging system, etc. The Affiant claimed to establish criminal intent for users who logged in, at the moment of login. This is only possible if he was able to establish criminal intent of "Knowing Access or Attempted Access With Intent to View Child Pornography" as defined under 18 USC §2252 et seq. So, under penalties of perjury, SA MacFarlane claimed to have established probable cause to believe that "any user who successfully access the TARGET WEBSITE has knowingly accessed with intent to view child pornography, or attempted to do so." (See NIT Affidavit Paragraph 10). There were over

100,000 unique logins during the period the FBI operated Playpen and distributed child pornography across the globe. It is literally IMPOSSIBLE for SA Macfarlane to have established probable cause or intent for that many people without knowing who they are, making particularized statements of individual users, etc. As a matter of fact, the government in another NIT Playpen case, US v Kim, 16-CR-191 (EDNY) even admitted that it was unfair to assume that every time a user logged in was for illegal activity, since there were chats, forums with legal content, etc. Also, no probable cause for any other Federal crime could have even been established by the NIT Affidavit, because it requests to search users with the NIT at the moment they log in. There is no child pornography on the login page or forum list. Also, many Tor users use a feature of Tor to disable "auto image loading", which Macfarlane would have known. This is probably why over 1,100 searched were innocent.

4) The name "Playpen" is associated with mainstream legal adult sites. It is a knockoff of Playboy magazine and strip clubs. Also, the Affiant never actually used the site name in the warrant or affidavit.

5) A site being located on the Dark Web doesn't immediately mean that criminal activity is occurring on the site. Tor was actually created by the US Naval Research Laboratory & continues to receive the majority of its funding from the US Government. In addition, the Department of Justice has advised Judges to use Tor to protect their online communications.[1] Millions of other people also use Tor for legitimate & legal reasons.[2] In addition, it is very easy to find random sites on the Dark Web. Many websites such as Pastebin.com have huge site lists with no descriptions. Users of Tor explore these sites regularly, which is called "Torsploring", when they have no idea what they will find.

A simple Google search also yields many results. (See Exhibit O) This search of "list of Tor sites" resulted in 92,300,000 results in .44 seconds, clearly demonstrating

[1] http://motherboard.com/en_us/article/xyg45n/department-of-justice-official-tells-hundred-federal-judges-to-use-tor
[2] http://www.nytimes.com/2010.12/19/magazine/19FOB-Medium-t.html?_r=0

the falsity of SA Macfarlane's claim on searching for Tor sites. In addition, there are many Tor based search engines. See, e.g. Kristen Hubby, Here Are The 13 Best Deep Web Search Engines, dailydot.com(Nov. 28, 2016)[1] In addition, even SA Macfarlane's claims about Tor sites not being indexed is blatantly false. By the government's own admission, the foreign nation who contacted the FBI with the true IP of Playpen due to a misconfiguration of the website, found it THROUGH INDEX BOTS. Hundreds of companies & nations index Tor to compile lists, wikis, & search engines.

6) SA Alfin tried to make the process of accessing a website on Tor sound incredibly complex, leading courts to believe that only tech savvy people who knew exactly what they are doing and what sites they want to go to, use the Dark Web. Imagine someone told you that in order to go to a specific location on the internet you had to "Enter a specific string of alpha-numeric characters into a hyper text transfer protocol to convert or interpret that string of characters into a specific internet protocol address, then enter a certain predetermined registration name as well as a password with a string of characters at least 8 digits long containing both alpha-numeric characters as well as symbols or numbers." This sounds complex right? Well you just logged into your Gmail account. Anything can sound complex if it's worded properly & this is what SA Macfarlane did to fool the Magistrate. In reality, to go to a Tor site is incredibly simple & requires no foreknowledge of computer mechanics etc. One simply goes to https://www.torproject.org and clicks whether you are using Windows or Mac. A folder is downloaded. Done. It doesn't even require installation. Any of the random websites you can find literally EVERYWHERE online can now be visited. It's literally that simple.

## Basic Frank's Arguments Petitioner Requested Counsel to Raise, Which Counsel Failed to Raise

The Petitioner presented to counsel all the aforementioned arguments before counsel filed the infirmed Motion for Frank's Hearing. Testimony of Agents, evidence, & articles dated past that date are simply used to prove the validity of prior raised arguments, &

---

[1] https://www.dailydot.com/layer8/best-deep-web-search-engines/

to show that they were meritorious.

Under Franks v Delaware, 438 U.S. 154 (1978), a defendant must make 2 showings. 1) That the affiant's statement was deliberately false or demonstrated reckless disregard for the truth, & 2) That the challenged statement or omission was essential to the Magistrate's finding of probable cause. As a veteran agent of 19 years, SA Douglas Macfarlane had absolutely no reason for presenting anything that was patently false. Especially considering that he regularly worked with investigations involving Tor & the internet. As stated in Davis v United States, 564 U.S. 229, 241 (2011) quoting Herring, infra @ page 599. "Responsible law enforcement officers will take care to learn what is required of them under the Fourth Amendment precedent and will conform their conduct to these rules." Presenting patently false information to establish probable cause in an Affidavit is exactly an example of how NOT to conform to the rules.

When examining the probable cause that would have existed without the material falsities by SA Macfarlane, "we are bound by the four corners of the affidavit & we may not consider what the officer executing the warrant knew or believed." US v Rose, 714 F.3d 382 (6th Cir. App. 2012) The 6th Circuit has consistently held its precedent that "we are bound by the four corners of the affidavit" when examining probable cause, See US v Abboud, 438 F.3d 554, 571 (6th Cir 2006) (citation omitted), US v Laughton, 409 F.3d 744, 751-52 (6th Cir 2005), and US v Christian, 925 F.3d 305 (6th Cir. 2019) The Supreme Court has also held, in Aguilar v Texas, 378 U.S. 108, 109 N.1 (1964) that "it is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention." By this analysis, we may not consider ANY image on the homepage, because the current one was never included in the affidavit. In addition, we cannot include individualized information about the activity of "billypedo", because none of the users searched by the NIT had any particularized information about them IN THE AFFIDAVIT. Even the name of the site has to be excised, because it was never mentioned in the Affidavit. In addition, the Google search information & index information must be removed. We are left with a homepage with no

logo or name, which says to register an account with a fake email to access the forum. Clearly there is no probable cause at that point. The Petitioner's position is that there never was to begin with, but this only puts more emphasis on the lack of probable cause. FBI in this Operation wanted to search everyone who logged in and stated so in the affidavit, so even the fact that they waited for users to click on a forum post (not download pornography), can't be used to establish probable cause. The fact is, FBI assumed, wrongly, that mere membership on the website created probable cause, without more particularized information. This is in direct conflict with Ybarra v Illinois, 444 U.S. 85 (1979), which holds that mere membership with an organization with an illegal purpose cannot, without evidence particularized to the target of the search, establish probable cause.

Phillips v Hoffner, 755 Fed.Appx. 481 (6th Cir. App 2018) citing Strickland v Washington, 466 U.S. 668 (1984) The prejudice prong asks whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, Id @ 694 "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

There is a significant probability, that if counsel had presented these arguments, backing them up with evidence, that the outcome of the pretrial motions phase would have been different. Seeing as how counsel never even addressed the NIT Affidavit, we will never know. We do know however, that failing to even attempt to raise them was a clear example of ineffective assistance of counsel. To this point, the Petitioner's Sixth Amendment protections were violated by counsel's repeated & gross ineffective assistance of counsel. He hereby respectfully requests an evidentiary hearing on the matters set forth in this petition.

### Requested Relief

Due to the multiple examples of ineffective assistance of counsel evidenced herein, the Petitioner respectfully requests the following relief:

1) Vacate the Petitioner's conviction & plea & order a new trial, allowing for pretrial motions, evidentiary hearings, etc., starting the entire process from the beginning; **OR**

2) Resentence the Petitioner to a total collective sentence of 25 years to serve in prison (the plea he would have taken but for counsel's errors was originally 24 years, but the current convictions only allow for a minimum of 25 years)

## Affirmation

I, Robert Jones, the Petitioner in this matter, pro se, do hereby affirm under penalties & pains of perjury that the aforegoing is true & accurate to the best of my beliefs and abilities.

Date: 9-20-2020

Robert Jones
#73413-061
USP Terre Haute
PO Box 33
Terre Haute, IN 47808

## Certificate of Service

I, Robert Jones, the Petitioner in this matter, pro se, do hereby certify that I placed this petition in the hands of prison officials through the prison legal mail system, to be mailed by US First Class Mail Post Paid this 20 Day of September, 2020.

Robert Jones
#73413-061
USP Terre Haute
PO Box 33
Terre Haute, IN 47808